**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, a
Delaware Corporation, et al,
<u>Debtors.</u>

LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, etc., et al,
<u>Debtors-Appellants,</u>

RESOLUTION TRUST CORPORATION, a
receiver (formerly conservator) for
Oak Tree Federal Savings Bank,
<u>Creditor-Appellant,</u>

v.

D. SCOTT CONE; JOHN WILSON REED,
<u>Respondents-Appellees,</u>

BERNARD G. ILLE, et al,
<u>Claimants-Appellees,</u>

JONES, DAY, REAVIS & POGUE;
MCGLINCHEY, STAFFORD & LANG;
MCNAIR & SANFORD, P.A.,
<u>Parties in Interest-Appellees,</u>

ALPHA NURSERY, INCORPORATED, et
al,
<u>Creditors,</u>

88314 ONTARIO LIMITED, et al,
<u>Claimants,</u>

No. 94-2475

BUREAU OF INDIAN AFFAIRS, et al,
Respondents,

US TRUSTEE,
Trustee.

In Re: LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, a
Delaware Corporation, et al,
Debtors.

LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, etc., et al,
Debtors-Appellees,

RESOLUTION TRUST CORPORATION, a
receiver (formerly conservator) for
Oak Tree Federal Savings Bank,
Creditor-Appellee,

No. 94-2490

v.

GERALD G. BARTON, et al,
Claimants-Appellants,

JONES, DAY, REAVIS & POGUE;
MCGLINCHEY, STAFFORD & LANG;
MCNAIR & SANFORD, P.A.,
Parties in Interest,

ALPHA NURSERY, INCORPORATED, et
al,
Creditors,

88314 ONTARIO LIMITED, et al,
Claimants,

2

BUREAU OF INDIAN AFFAIRS, et al,
Respondents,

US TRUSTEE,
Trustee.

In Re: LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, a
Delaware Corporation, et al,
Debtors.

LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, etc., et al,
Debtors-Appellees,

RESOLUTION TRUST CORPORATION, a
receiver (formerly conservator) for
Oak Tree Federal Savings Bank,
Creditor-Appellee,

v.

MCNAIR & SANFORD, P.A.,
Party in Interest-Appellant,

JONES, DAY, REAVIS & POGUE;
MCGLINCHEY, STAFFORD & LANG,
Parties in Interest,

ALPHA NURSERY, INCORPORATED, et
al,
Creditors,

88314 ONTARIO LIMITED, et al,
Claimants,

No. 94-2491

3

BUREAU OF INDIAN AFFAIRS, et al,
Respondents,

US TRUSTEE,
Trustee.

In Re: LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, a
Delaware Corporation, et al,
Debtors.

LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, etc., et al,
Debtors-Appellees,

RESOLUTION TRUST CORPORATION, a
receiver (formerly conservator) for
Oak Tree Federal Savings Bank,
Creditor-Appellee,

v.                                                                                          No. 94-2492

MCGLINCHEY, STAFFORD & LANG,
Party in Interest-Appellant,

JONES, DAY, REAVIS & POGUE;
MCNAIR & SANFORD, P.A.,
Parties in Interest,

ALPHA NURSERY, INCORPORATED, et
al,
Creditors,

88314 ONTARIO LIMITED, et al,
Claimants,

4

BUREAU OF INDIAN AFFAIRS, et al,
Respondents,

US TRUSTEE,
Trustee.


In Re: LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, a
Delaware Corporation, et al,
Debtors.

LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, etc., et al,
Debtors-Appellees,

RESOLUTION TRUST CORPORATION, a
receiver (formerly conservator) for
Oak Tree Federal Savings Bank,
Creditor-Appellee,

No. 94-2493

v.

JONES, DAY, REAVIS & POGUE,
Party in Interest-Appellant,

MCNAIR & SANFORD, P.A.;
MCGLINCHEY, STAFFORD & LANG,
Parties in Interest,

ALPHA NURSERY, INCORPORATED, et
al,
Creditors,

88314 ONTARIO LIMITED, et al,
Claimants,

BUREAU OF INDIAN AFFAIRS, et al,
Respondents,

US TRUSTEE,
Trustee.


In Re: LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, a
Delaware Corporation, et al,
Debtors.

LANDMARK LAND COMPANY OF
CAROLINA, INCORPORATED, etc., et al,
Debtors-Appellants,

RESOLUTION TRUST CORPORATION, a
receiver (formerly conservator) for
Oak Tree Federal Savings Bank,

Creditor-Appellant,

v.

D. SCOTT CONE; JOHN WILSON REED,
Respondents-Appellees,

BERNARD G. ILLE, et al,
Claimants-Appellees,

JONES, DAY, REAVIS & POGUE;
MCGLINCHEY, STAFFORD & LANG;
MCNAIR & SANFORD, P.A.,
Parties in Interest-Appellees,

No. 94-2550

ALPHA NURSERY, INCORPORATED, et
al,
Creditors,

88314 ONTARIO LIMITED, et al,
Claimants,

BUREAU OF INDIAN AFFAIRS, et al,
Respondents,

US TRUSTEE,
Trustee.

Appeals from the United States District Court
for the District of South Carolina, at Charleston.
Falcon B. Hawkins, Chief District Judge.
(CA-91-5287-2-1, CA-91-3287-2-1, BK-91-5814, CA-91-5386-2-1,
CA-91-3286-2-1, BK-91-5815, CA-91-5291-2-1, CA-91-3291-2-1,
BK-91-5816, CA-91-5290-2-1, CA-91-3290-2-1, BK-91-5817,
CA-91-5289-2-1, CA-91-3289-2-1, BK-91-5819, CA-91-5288-2-1,
CA-91-3288-2-1, BK-91-5818, CA-92-3548-2-1, BK-92-77109)

Argued: June 8, 1995

Decided: February 15, 1996

Before RUSSELL, NIEMEYER, and MICHAEL, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Russell wrote the opinion, in which Judge Niemeyer and Judge
Michael joined.

_____

**COUNSEL**

**ARGUED:** Henry Robbins Lord, PIPER & MARBURY, Baltimore,
Maryland, for Appellants. John Wilson Reed, New Orleans, Louisi-

ana; Patrick Michael Duffy, MCNAIR & SANFORD, P.A., Charleston, South Carolina, for Appellees. **ON BRIEF:** Stephen H. Kaufman, PIPER & MARBURY, Baltimore, Maryland; Nathan B. Feinstein, Daniel J. Carrigan, Timothy P. Branigan, Kimberly E. Wolod, PIPER & MARBURY, Washington, D.C.; Kevyn D. Orr, RESOLUTION TRUST CORPORATION, Washington, D.C., for Appellants. Richard L. Tapp, Jr., MCNAIR & SANFORD, P.A., Charleston, South Carolina; M. Dawes Cooke, Jr., Robert Gritton, BARNWELL, WHALEY & STEVENSON, Charleston, South Carolina; Craig Caesar, Timothy Scott, MCGLINCHEY, STAFFORD & LANG, New Orleans, Louisiana; Paul O'Hearn, R. Matthew Martin, JONES, DAY, REAVIS & POGUE, Atlanta, Georgia; Evan Park Howell, III, Metairie, Louisiana, for Appellees.

_____

**OPINION**

RUSSELL, Circuit Judge:

This case comes before this Court at the twilight of the Debtors' bankruptcy proceedings. The Resolution Trust Corporation ("RTC") has already taken control of the Debtors and has liquidated their assets. The bankruptcy proceedings have proven to be successful, with the debtors-in-possession paying each claim in full. On this appeal, the second to this Court, we consider only whether the debtors' estates must indemnify several of the Debtors' former directors, officers, and employees for their costs in defending themselves against civil proceedings brought by the Office of Thrift Supervision ("OTS") in connection with the bankruptcy filings. The district court found that the Debtors' estates must indemnify these directors, officers, and employees for their defense costs. We affirm in part and reverse in part.

I.

A. The OTS Charges

On October 11, 1991, the Debtors (with one exception) filed for bankruptcy.[1] The Debtors were first- and second-tier subsidiaries of

_____

[1] The Debtors are Landmark Land Company of Carolina, Inc. ("Landmark Carolina"), Landmark Land Company of Oklahoma, Inc.

Oak Tree Savings Bank, S.S.B. ("Bank"). At the top of the corporate structure was Landmark Land Company, Inc. ("Landmark Land"), a publicly traded company. It was a holding company and whole owner of the Bank, which was the whole owner of Clock Tower, which in turn was the holding company and whole owner of Landmark Carolina, Landmark Oklahoma, Landmark Florida, Landmark Louisiana, and Landmark California.

Gerald G. Barton and William W. Vaughan, III, were prominent figures in the Landmark corporations. Barton was the chairman of the board of directors of Landmark Land, the Bank, and all of the subsidiaries. He was also the chief executive officer of Landmark Land and the Bank, and a 29% shareholder of Landmark Land. Vaughan, Barton's son-in-law, was a director and officer of the Bank and most of the subsidiaries. An attorney, he was the general counsel to the subsidiaries. Joe W. Walser played a less prominent role in the Landmark hierarchy, but he served as a director of the Bank and some of the subsidiaries. Bernard G. Ille served as a director of only the Bank, but he did not participate actively in the management of the Bank or the subsidiaries. He was employed by First Life Assurance Company, a subsidiary of Landmark Oklahoma.

Prior to the bankruptcy filings, the subsidiary companies invested profitably in real estate using the Bank's funds to finance their operations. They developed, owned, and managed residential resort communities, complete with golf courses, tennis courts, and polo facilities. During this time, the Bank loaned the subsidiaries more than $986 million.

The financial position of the Landmark organization eventually deteriorated. An OTS investigation on June 4, 1990 revealed that the Bank was undercapitalized and had demonstrated a pattern of consis-

_____

("Landmark Oklahoma"), Landmark Land Company of Florida, Inc. ("Landmark Florida"), Landmark Land Company of Louisiana, Inc. ("Landmark Louisiana"), Landmark Land Company of California, Inc. ("Landmark California"), and Clock Tower Place Investments Ltd. ("Clock Tower"). Carmel Valley Ranch did not file for bankruptcy at this time and is not involved in this indemnification dispute.

tent losses. Despite several attempts, the Bank was unable to submit to the OTS an acceptable plan for meeting the minimum capital requirements. On January 15, 1991, the directors of the Bank signed a Consent Agreement with the OTS in which they agreed that the Bank's subsidiaries would not enter into any material transaction without prior approval from the OTS. The Consent Agreement indicated that the Bank was near failure and that an OTS takeover was imminent.

Despite the terms of the Consent Agreement, the subsidiaries filed for bankruptcy. Anticipating that the OTS would act quickly to take control of the Bank, the Debtors immediately sought and obtained from the bankruptcy court a temporary restraining order preventing the Bank from exercising its shareholder rights to remove and replace the management of the Debtors.

The bankruptcy filings did not receive a pleasant reception from the OTS. On October 13, 1991, as expected, the OTS took control of the Bank and appointed the Resolution Trust Corporation ("RTC") to act as receiver for the Bank.**2**See Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989) (codified in scattered sections of 12 U.S.C.). More importantly, the OTS filed civil administrative charges against Barton, Vaughan, Walser, and Ille (collectively, the "Directors"). The OTS alleged that the Directors breached their fiduciary duties to the Bank because they knew that the bankruptcy filings would have a substantially adverse effect on the Bank's ability to collect on the secured and unsecured lines of credit to the Debtors. The OTS also charged the Directors with violating the terms of the Consent Agreement by having the Debtors enter into a material transaction--the filing for bankruptcy--without receiving OTS approval. The OTS assessed a fine of one million dollars against the Directors, and it fined Landmark Land $500,000 for each day it failed

_____

**2** The RTC then organized, and the OTS chartered, Oak Tree Federal Savings Bank, F.S.B. ("New Oak Tree"). Pursuant to a purchase and assumption agreement, New Oak Tree purchased all of the RTC's right, title and interest in Oak Tree's assets, including its wholly owned subsidiaries. The OTS then appointed the RTC as conservator for New Oak Tree.

to seek dismissal of the bankruptcy proceedings. On November 18, 1991, the OTS amended its charges to add allegations that the Directors had mishandled certain large loans. The Directors hired attorneys to defend themselves against the OTS charges.

As the OTS continued its investigation into the Bank's affairs, several members of the Bank's accounting department became subjects of investigation. D. Scott Cone,[3] although he was an officer and director of Landmark Louisiana, headed the Bank's accounting department. Mohamed Motahari was a vice-president and the comptroller of the Bank. Gina Trapani was a vice-president, assistant comptroller, and tax manager of the Bank. Gary Braun was an accountant for the Bank. Motahari, Trapani, and Braun became employees of Landmark Louisiana soon after the Debtors' filed for bankruptcy.

By March or April 1992, Cone, Motahari, Trapani, and Braun (collectively, the "Employees"), believing that the OTS might take action against them, retained counsel. On April 21, 1992, the OTS filed civil administrative charges against Cone and Motahari. The OTS alleged that, in monthly reports to federal regulators, they had misrepresented that the Debtors' debt to the Bank was secured, even though it was actually unsecured. The OTS never brought charges against Trapani or Braun.

B. The Reimbursement Motion

Although the RTC took control of the Bank, the original boards of directors remained in control of the Debtors until September 1992. Once the RTC was appointed conservator of the Bank, it immediately moved the district court to lift the temporary restraining order so that it could call a shareholders meeting and exercise its ownership rights over the Debtors. However, the district court, acting as the bankruptcy court, denied the RTC's motion and converted the temporary restraining order into a preliminary injunction. See Landmark Land Co. of Carolina v. Resolution Trust Corp. (In re Landmark Land Co. of Okla.), 134 B.R. 557 (D.S.C. 1991), rev'd 973 F.2d 283 (4th Cir. 1992). The RTC was not able to take control of the subsidiaries until

_____

[3] Cone died during the course of this litigation and is represented by his estate.

11

this Court lifted the injunction on August 18, 1992. See In re Landmark Land Co. of Okla., 973 F.2d 283 (4th Cir. 1992). On September 12, 1992, the RTC took control of the Debtors, terminated the original boards of directors, and fired the Debtors' attorneys.

During the eleven-month interim when the original board controlled the Debtors, the Directors arranged for the Debtors to pay for the fees and costs of defending themselves against the OTS charges. On March 26, 1992, the Debtors filed a Reimbursement Motion requesting permission to fund the Directors' indemnification. After making the motion, several of the Debtors' boards of directors met to approve the indemnification.

On April 8, 1992, the board of directors for Landmark Oklahoma met to discuss and vote on indemnification for Walser and Ille. Landmark Oklahoma's board consisted of three members: Barton, Lowery Bea Roselle, and Bill D. Thompson. Only Roselle and Thompson were present, but the two constituted a quorum. They found that Walser and Ille "had acted in good faith and in a manner they reasonably believed to be in, or not opposed to, the best interests of [Landmark Oklahoma]." Accordingly, the board voted in favor of indemnification.

On April 21, 1992, the board of directors for Clock Tower met to discuss and vote on indemnification for Barton and Vaughan. Clock Tower's board consisted of five members: Barton, Vaughan, Roselle, Thompson, and a fifth director. At the time of the meeting, the fifth director had resigned and had not yet been replaced. The other four members of the board were present, constituting a quorum. The board found that Barton and Vaughan "had acted in good faith and in a manner they reasonably believed to be in, or not opposed to, the best interests of [Clock Tower]." Roselle and Thompson voted in favor of indemnification, and Barton and Vaughan abstained from the vote.

Although the Employees were not included in the Reimbursement Motion, the board of directors for Landmark Louisiana met on April 21, 1992 to discuss and vote on indemnification for the Employees. Landmark Louisiana's board consisted of five members: Barton, Vaughan, Cone, Roselle, and Thompson. Cone was not present, but the other four directors constituted a quorum. The board found that

12

the Employees had acted in good faith and in the best interests of Landmark Louisiana, and they voted unanimously to indemnify the Employees for their expenses. Barton and Vaughan participated in the vote.

On June 3, 1992, the district court held a hearing on the Reimbursement Motion. The court did not rule on the motion at the time, and the motion remained dormant for almost two years.

On August 27, 1992, the Debtors amended their Reimbursement Motion to include the Employees' legal expenses. Even before this formal application, however, the Debtors had already begun indemnifying the Employees. In March 1992, Clock Tower paid $21,825 toward Motahari's legal expenses, and Landmark Louisiana paid $1,000 toward Braun's expenses. In June 1992, Clock Tower paid $35,398.48 toward Cone's, Motahari's, and Trapani's legal expenses. Thus, Clock Tower paid more than $57,000 toward the Employees' legal expenses, even though its board never voted to indemnify them. In total, the Debtors have paid $122,493.20 of the Employees' legal expenses.

C. The RTC-controlled Debtors

The RTC took control of the Debtors on September 12, 1992, and replaced the boards of directors. On November 5, 1992, the RTC-controlled Debtors sought, by means of a consent order, to withdraw the Reimbursement Motion. The district court denied the withdrawal because it had already heard argument on the motion and had taken the motion under advisement. The district court also recognized that the beneficiaries of the Reimbursement Motion--namely, the Directors and the Employees--were not represented in the proposed consent order.

The RTC, once it took control of the Debtors, decided that it was advantageous to operate the Debtors in bankruptcy and chose not to withdraw the Debtors from the bankruptcy proceedings. The RTC even decided to place another Bank subsidiary, Carmel Valley Ranch, in bankruptcy. The RTC filed a reorganization plan for the Debtors that was approved by the district court.

13

Meanwhile, the OTS settled its civil administrative actions against some of the Directors and Employees. On October 30, 1992, the OTS dropped its charges against Cone and Motahari in exchange for their consent to orders (1) prohibiting them from participating in the affairs of any insured depository institution and (2) debarring them from practicing before the OTS. Although Cone and Motahari accepted prohibition and debarment, neither admitted, and both specifically disputed, the OTS charges.

On April 1, 1993, the OTS dropped the charges against Ille with only the mildest rebuke: Ille had to sign a cease and desist order, prohibiting him from engaging in unsafe and unsound banking practices and from breaching fiduciary duties to a federally insured depository institution. In other words, Ille agreed to follow diligently in the future the standard of conduct already required of him. Ille received this lenient treatment because he did not participate in the bankruptcy filings. He learned of the decision to place the Debtors in bankruptcy during a telephone call from Barton on the evening of October 10, 1991, the day before the bankruptcy filings; that same evening, he resigned from his position as a director of the Bank. At most, Ille failed only to follow the affairs of the Bank more diligently.

As of the date of this opinion, the OTS proceedings against Barton, Vaughan, and Walser remain unresolved.

D. The District Court's Orders

On May 27, 1994, more than two years after the filing of the motion, the district court granted the Reimbursement Motion. The district court found that "the evidence demonstrates that the officers and directors of the Debtor companies sought the protection of the bankruptcy court in good faith." In re Landmark Land Co. of Okla., Civ. Action No. 2:91-5286-1, order at 12 (D.S.C. May 27, 1994) (J.A. 1278). It also concluded that the RTC-controlled Debtors "ratified the decision to reorganize under the protection of the bankruptcy court, demonstrating that the placement of the Debtors into bankruptcy is reasonably viewed as being in the best interests of the Debtors." Id. Thus, the district court ordered the Debtors' estates to indemnify the Directors and Employees for their defense costs, and it granted the applications for payment from the Employees' attorneys.

14

The RTC-controlled Debtors filed a motion for reconsideration on June 6, 1994. When the Debtors filed this motion, the following parties moved to intervene:

> 1. the Directors;
>
> 2. McNair & Sanford, P.A. ("McNair"), the attorneys for the Debtors before the RTC took control;
>
> 3. Jones, Day, Reavis & Pogue ("Jones Day") and McGlinchey, Stafford & Lang ("McGlinchey"), the Directors' former OTS defense attorneys;
>
> 4. John W. Reed (of Glass & Reed), attorney for Cone; David Popper (of Popper & Popper), attorney for Motahari; Herbert V. Larson, Jr., attorney for Motahari; Robert H. Habans, attorney for Trapani; and William R. Campbell, Jr., attorney for Braun.

The district court granted their motions to intervene on August 31, 1994. The Employees themselves did not move to intervene.

On October 5, 1994, the district court denied the Debtors' motion for reconsideration with respect to the indemnification of the Directors. The district court did, however, grant the motion for reconsideration with respect to the applications of the Employees' attorneys. In a separate order on November 9, 1994, the district court approved the applications for payment from the Employees' attorneys.

The RTC and the RTC-controlled Debtors appeal from the district court's orders.

II.

The RTC and the RTC-controlled Debtors raise a host of arguments challenging the district court's granting of the Reimbursement Motion. Rather than addressing all of their arguments, we address the issue most troubling to us about the district court's decision: the district court's finding that the Directors acted in good faith and in the

15

best interests of the Debtors. We conclude that the district court clearly erred in finding that the Directors, with the exception of Ille, acted in good faith.**4**

A.

California, Oklahoma, and Louisiana have similar statutes regarding the indemnification of officers and directors for the costs and expenses of legal proceedings.**5** Under the California statute (as well as the other statutes), indemnification is mandatory if a corporate agent successfully defends himself in any proceeding. In such a case, the corporation has a duty to indemnify the agent for his costs and expenses, and the agent can sue the corporation if it fails to do so.

Even where the litigation does not result in a complete vindication for the agent, "[a] corporation shall have the power to indemnify any person who was or is a party or is threatened to be made a party to any proceeding . . . if that person acted in good faith and in a manner the person reasonably believed to be in the best interests of the corporation . . . ." Cal. Corp. Code § 317(b). Thus, the statute allows for indemnification even where the agent was negligent or committed some error, as long as the agent acted in good faith and in the best

_____

**4** At least one court has held that the good faith determination is a question of fact reviewed under a clearly erroneous standard. <u>Plate v. Sun-Diamond Growers of Calif.</u>, 275 Cal. Rptr. 667, 672 (Cal. Ct. App. 1990) (holding that the "question of whether a corporate agent . . . acted in good faith and for the best interests of the corporation[ ] appears to be an essentially factual question for the trial court"). The good faith determination strikes us as a question of law, or at least a mixed question of law and fact; although the facts supporting the good faith determination should be reviewed for clear error, an appellate court should review <u>de novo</u> whether or not those facts lead to the conclusion that the agent acted in good faith. Nonetheless, we need not at this time decide the appropriate standard of review for the good faith determination because our reasoning applies under either standard.

**5** California law applies to Barton and Vaughan, Oklahoma law to Walser and Ille, and Louisiana law to the Employees. Because the indemnification statutes are substantially similar, <u>compare</u> Cal. Corp. Code § 317 <u>with</u> Okla. Stat. tit. 32, § 1031 <u>and</u> La. Rev. Stat. Ann. § 12:83, we focus on the California statute for purposes of this discussion.

16

interests of the corporation. <u>Plate v. Sun-Diamond Growers of Calif.</u>, 275 Cal. Rptr. 667, 672 (Cal. Ct. App. 1990). In such circumstances, indemnification is only permissive: the corporation does not have a duty to indemnify the agent but simply has the option to indemnify as long as the good faith requirement is satisfied.

Indemnification is never allowed where the agent acted in bad faith and against the best interests of the corporation. As one California court has stated:

> Indemnification, if permitted too broadly, may violate . . . basic tenets of public policy. It is inappropriate to permit management to use corporate funds to avoid the consequences of wrongful conduct or conduct involving bad faith. A director, officer, or employee who acted wrongfully or in bad faith should not expect to receive assistance from the corporation for legal or other expenses and should be required to satisfy not only any judgment entered against him but also expenses incurred in connection with the proceeding from his personal assets. Any other rule would tend to encourage socially undesirable conduct.

<u>Plate</u>, 275 Cal. Rptr. at 672 (citing 2 American Bar Assoc., Model Business Corp. Act Ann., introductory cmt. to chapter 8, at 1082 (3d ed. 1987 supp.)).**6**

Thus, there are two requirements for permissive indemnification under § 317(b): (1) the corporation must authorize the indemnification, and (2) the agent must have acted in good faith and in the best interests of the corporation. It is not clear, however, whether the good faith determination should be made by a court or by the corporation itself. Section 317(e) provides that, before a corporation can authorize indemnification, the corporation must determine that the agent has acted in good faith and in the best interests of the corporation. The corporation can make this determination in any of the following ways:

---

**6** The most recent supplement to the Model Business Corporation Act Annotated contains similar but slightly different language. <u>See</u> 2 American Bar Assoc., Model Business Corp. Act Ann., introductory cmt. to subchapter E of chapter 8, at 8-289 to 8-290 (3d ed. 1995 supp.).

17

(1) A majority vote of a quorum consisting of directors who are not parties to such proceeding.

(2) If such a quorum of directors is not obtainable, by independent legal counsel in a written opinion.

(3) Approval of the shareholders . . . , with the shares owned by the person to be indemnified not being entitled to vote thereon.**7**

Cal. Corp. Code § 317(e). At first glance,§ 317(e) suggests that the corporation's finding of good faith settles the matter, and that the court's role is limited to ensuring that the corporation made its finding of good faith by proper procedures.

We do not agree that the court's role is so narrow. Although a corporation has to find that the agent acted in good faith before authorizing indemnification, nothing in § 317(e) restricts a court's authority under § 317(b) to make an independent assessment of the agent's good faith. Section 317(b) allows permissive indemnification where the agent has acted in good faith, not where the corporation finds that the agent has acted in good faith. Reading § 317(b) together with § 317(e), we conclude that the issue of an agent's good faith is a question for the courts to decide.

_____

**7** The California Code also provides a fourth way in which a corporation can determine that an agent has acted in good faith and in the best interests of the corporation:

> (4) The court in which the proceeding is or was pending upon application made by the corporation or the agent or the attorney or other person rendering services in connection with the defense, whether or not the application by the agent, attorney or other person is opposed by the corporation.

Cal. Corp. Code § 317(e)(4). This fourth option, which is not found in the Oklahoma or Louisiana statutes, is actually an exception. It provides that an agent can receive indemnification over the corporation's opposition if the court in the proceedings for which the agent seeks indemnification found that the agent acted in good faith and in the best interests of the corporation.

18

In making the good faith determination, however, a court cannot ignore the factual findings made during the underlying proceeding for which the agent seeks indemnification. If the court or administrative panel in the underlying litigation made factual findings relevant to the determination of the agent's good faith, the indemnification court cannot reevaluate the evidence and reach the opposite conclusion. Even the findings of an administrative agency have collateral estoppel effect on the indemnification court. As the Supreme Court has stated:

> When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.

United States v. Utah Construction & Mining Co. , 384 U.S. 394, 422 (1966).

Furthermore, where a court decides the question of indemnification before the completion of the underlying proceeding, the court must tread even more carefully. In determining whether or not the agent acted in good faith and in the best interests of the corporation, the indemnification court should not make any factual or legal determinations that are properly before the court or administrative panel in the underlying proceeding. The indemnification court should not base its good faith determination on its own conclusions about the merits of the charges in the underlying proceeding.

The indemnification court, however, does not need to postpone its determination until after the completion of the underlying proceeding. The indemnification court should consider whether the agent could have acted in good faith and in the best interests of the corporation if the charges against the agent turn out to be true.[8] If the indemnifica-

_____

**8** The indemnification court does not need to consider the agent's good faith if the charges turn out to be false. If the agent succeeds on the merits in the underlying proceeding, he is entitled to mandatory indemnification. See Cal. Corp. Code § 317(d). In such a situation, the issue of permissive indemnification would be moot, thus rendering the good faith determination unnecessary.

19

tion court finds that the agent could have acted in good faith even if the charges were true, it should grant indemnification because the indemnification determination is not contingent on the result of the underlying proceeding. On the other hand, if the indemnification court finds that the agent's alleged misconduct, if true, demonstrates that the agent acted in bad faith, the indemnification court should deny permissive indemnification; it should hold its indemnification decision in abeyance until the completion of the underlying proceedings and then grant indemnification only if the agent succeeds on the merits. For instance, an agent defending himself against charges of negligent conduct should receive indemnification if the indemnification court finds that the agent, even if he were negligent, acted in good faith. However, an agent defending himself against charges of intentionally wrongful conduct should receive indemnification only if he succeeds on the merits.

In the instant case, it is not clear whether the district court--the indemnification court in this case--recognized the proper scope of its "good faith" determination. In finding that the Directors acted in good faith and in the best interest of the Debtors when they filed the petitions for bankruptcy, the district court offered little explanation on how it reached its finding. In its May 27, 1994 order, it simply stated:

> [T]his court finds that the evidence demonstrates that the officers and directors of the Debtor companies sought the protection of the bankruptcy court in good faith. Further this court finds that the Debtors' new management ratified the decision to reorganize under the protection of the bankruptcy court, demonstrating that the placement of the Debtors into bankruptcy is reasonably viewed as being in the best interest of the Debtors.

In re Landmark Land Co. of Okla., Civ. Action No. 2:91-5286-1, order at 12 (D.S.C. May 27, 1994) (J.A. 1278). Neither in this order nor in any of its subsequent orders did the district court articulate how the evidence demonstrated the Directors' good faith. More importantly, the district court did not explain how the Directors could have acted in good faith if the OTS charges filed against them were true.

Apparently, the district court's finding of the Directors' good faith stems from its belief that the OTS charges had no merit. From the

20

very beginning of the bankruptcy proceedings, the district court found that the Directors "possesse[d] the requisite expertise to continue managing the debtors' estates in a manner most profitable for the preservation of corporate assets." Landmark Land Co. of Carolina v. Resolution Trust Corp. (In re Landmark Land Co. of Okla., 134 B.R. 557, 560 (D.S.C. 1991), rev'd 973 F.2d 283 (4th Cir. 1992). It found that "the RTC ha[d] acted with complete disregard of the efforts of management to keep the debtor companies afloat." Id. It seems that the district court believed that federal regulators were hampering the Directors' legitimate efforts to reorganize the companies, and that the Directors sought the protection of the bankruptcy code to protect themselves from an overrun bureaucracy. The district court thought little of the OTS charges, referring to them as an attempt by the OTS to "seek[ ] atonement from the named Debtor officers for placing the Debtor companies in bankruptcy." In re Landmark Land Co. of Okla., Civ. Action No. 2:91-5286-1, order at 8 (D.S.C. Oct. 5, 1994) (J.A. 2452). Furthermore, it found that the Directors had the best interests of the Debtors in mind when they filed for bankruptcy because the RTC ratified the Directors' action by keeping the Debtors in bankruptcy once it obtained control over them.

Even if the district court was correct that the OTS was inept and overbearing, the Directors' action to file for bankruptcy was a deliberate attempt to circumvent the regulatory authority that Congress had clearly given to the OTS. Congress created the OTS in 1989 in response to the crisis in the savings and loan industry, which occurred when the insolvency of a large number of savings and loans bankrupted the Federal Savings and Loan Insurance Corporation. Although the majority of savings and loans were healthy financial institutions, Congress found that the thrift crisis was concentrated in the roughly twenty-five percent of the industry having capital, measured under generally accepted accounting principles, of less than three percent. H.R. Rep. No. 101-54(I), 101st Cong., 1st Sess. 303 (1989), reprinted in 1989 U.S.C.C.A.N. 86, 99. Congress found that, "[t]o a considerable extent, the size of the thrift crisis resulted from the utilization of capital gimmicks that masked the inadequate capitalization of thrifts. . . . [I]f a crisis of this nature is to be prevented from happening again, thrifts must be adequately capitalized against losses." H.R. Rep. No. 101-54(I), 101st Cong., 1st Sess. 310 (1989), reprinted in 1989 U.S.C.C.A.N. 86, 106. Congress invested the OTS

21

with broad regulatory powers to oversee financial institutions and ensure that they were adequately capitalized.

By placing the Debtors in bankruptcy, the Directors intended to prevent the OTS from enforcing the minimum capitalization requirement against the Bank. According to the OTS charges, the OTS investigated the Bank on June 4, 1990 and found that the Bank was inadequately capitalized and had demonstrated a pattern of repeated losses. The OTS directed the Bank to infuse sufficient capital to meet the minimum capitalization requirement, but the Bank did not submit an acceptable plan. Because of the Bank's inability to meet the requirement, the OTS forced the Bank directors to sign a Consent Agreement on January 15, 1991, signalling to the Directors that an OTS takeover was imminent. Instead of working with the OTS to correct the Bank's capitalization problem, the Directors filed the bankruptcy petitions to prevent the OTS from exercising control of the Bank's subsidiaries.

We cannot conclude that the Directors' action was taken in good faith. If the OTS charges are accurate, the Director's action to place the Debtors in bankruptcy was a deliberate attempt to prevent the OTS from exercising control over the Bank's assets, thus hindering the OTS's ability to deal effectively with a failing savings and loan. Despite the district court's findings that the federal regulators had interfered with the Directors' efforts to keep the Debtors afloat, the fact remains that the Bank could not comply with the minimum capitalization requirement, and the OTS therefore had a statutory duty to force the Bank's management to comply with the capitalization requirement. The Directors acknowledged the OTS's regulatory authority when they signed the Consent Agreement and agreed that the Bank's subsidiaries would not enter into any material transaction without prior approval from the OTS. When the OTS threatened to take control of the Bank, however, the Directors' used the bankruptcy code to stymie the OTS, even though their action breached the Consent Agreement with the OTS and violated their fiduciary duties to the Bank. We cannot condone the Directors' blatant attempt to circumvent the OTS's regulatory authority by holding that they acted in good faith.

Even if the bankruptcy filings benefitted the Debtors, we still could not conclude that the Directors acted in good faith. An agent who has

22

intentionally participated in illegal activity or wrongful conduct against third persons cannot be said to have acted in good faith, even if the conduct benefits the corporation. Plate , 275 Cal. Rptr. at 672. "For example, corporate executives who participate in a deliberate price-fixing conspiracy with competing firms could not be found to have acted in good faith, even though they may have reasonably believed that a deliberate flouting of the antitrust laws would increase the profits of the corporation." 1 Harold Marsh, Jr. and R. Roy Finkle, Marsh's California Corporation Law (3d ed.) § 10.43, at 751; see Plate, 275 Cal. Rptr. at 672 (citing same language from second edition). We recognize that the Directors did not break any law by filing the bankruptcy petitions, and that the OTS has not filed criminal charges against the Directors. Nonetheless, we find that a deliberate attempt to undermine the regulatory authority of a government agency cannot constitute good faith conduct, even if such actions benefit the corporation.

The Directors intentionally breached their fiduciary duties to the Bank and their Consent Agreement with the OTS in order to prevent the OTS from exercising the powers granted to it under FIRREA. The Directors knew the impropriety of their actions, and one of the Directors--Ille--resigned his position when he learned of the scheme. We therefore conclude that the Directors did not act in good faith when they placed the Debtors in bankruptcy.

B.

We do not reach the same conclusion with respect to Ille. Because the OTS and Ille entered into a settlement and the OTS has dropped its charges against Ille, we have the benefit of the factual admissions contained in the settlement agreement. That agreement confirms that Ille had no part in the filing of the bankruptcy petitions. He learned of the decision to place the Debtors in bankruptcy on the evening of October 10, 1991, the day before the bankruptcy filings. Ille resigned his directorship later that same evening. In the settlement agreement, Ille admitted knowing of numerous serious underwriting deficiencies on loans approved by the Bank, and that he relied on representations by the Bank's management that these deficiencies were being addressed instead of his independently investigating the deficiencies known to him. At most, Ille failed only in his duties to follow the

23

affairs of the Bank more diligently. The OTS, recognizing Ille's minimal participation, dropped the charges against him with only a mild punishment: it required Ille to sign a cease and desist order prohibiting him, in effect, from his breaching fiduciary duties in the future.

The terms of Ille's settlement agreement informs our decision regarding whether Ille acted in good faith and in the best interests of the corporation. The settlement agreement confirms that Ille committed no intentional wrongful act. Most importantly, upon realizing that the other Directors had schemed to circumvent the OTS's authority by placing the Debtors into bankruptcy, he immediately resigned from his position as a Bank director. We find that Ille acted in good faith and in the best interests of the Debtors.

We conclude, however, that Ille cannot receive indemnification from Landmark Oklahoma because he was not an agent of that corporation. Ille was not a member of the boards of directors of Landmark Oklahoma or any of the Bank's other subsidiaries. He was a director only of the Bank, and as the settlement agreement shows, he was not an active participant in the management of either the Bank or the subsidiaries. Ille's only connection to Landmark Oklahoma is that he was employed by First Life Assurance Company ("First Life"), a subsidiary of Landmark Oklahoma. His employment status, however, does not make him an agent of Landmark Oklahoma, especially because First Life has no involvement whatsoever in the bankruptcy filings or this litigation. Because Ille was not an agent of Landmark Oklahoma, he would have to seek indemnification from the Bank. Hence, Ille is not entitled to indemnification from Landmark Oklahoma.

Although Ille has not sought indemnification from the Bank, we note that, under Louisiana law, Ille would likely be entitled to mandatory indemnification from the Bank.**9** The Louisiana indemnification statute provides for mandatory indemnification of an agent to the extent that he "has been successful on the merits or otherwise in defense" of the OTS charges. La. Rev. Stat. Ann.§ 12:83(B). Ille never received an adjudication on the merits, but courts in other jurisdictions have interpreted similar language to require indemnification

_____

**9** The Louisiana indemnification statute would apply to the Bank because it was chartered under Louisiana law.

24

when a settlement agreement demonstrates that the agent succeeded on the merits. See Wisener v. Air Express Int'l Corp., 583 F.2d 579, 583 (2d Cir. 1978) (holding, under Illinois law, that the phrase "on the merits or otherwise" is "surely . . . broad enough to cover a termination of claims by agreement without any payment or assumption of liability."); Waltuch v. Conticommidity Servs. Inc., 833 F. Supp. 302, 310-11 (S.D.N.Y. 1993) (following Wisener in interpreting Delaware law, although ultimately concluding that plaintiff was not successful on merits); B & B Investment Club v. Kleinert's, Inc., 472 F. Supp. 787, 790-91 (E.D. Pa. 1979) (interpreting Pennsylvania law). But see American Nat'l Bank & Trust Co. of Eau Claire, Wis. v. Schigur, 148 Cal. Rptr. 116, 117-18 (Cal. Ct. App. 1978) (holding, under California law, that mandatory indemnification requires a judicial determination of the merits of the agent's defense).**10** The settlement agreement strongly suggests that Ille successfully defended himself against the OTS charges. Nevertheless, we cannot reach the issue of mandatory indemnification because the Bank is not a defendant and has not had an opportunity to argue against mandatory indemnification.**11**

_____

**10** The reasoning of the California court in American Nat'l Bank & Trust does not apply to Louisiana law. The mandatory indemnification provision in most states follows the language of the Model Business Corporations Act, which provides for mandatory indemnification of an agent who "has been successful on the merits or otherwise in defense" of any action. 1 Model Business Corporations Act Ann.2d§ 5; see, e.g., La. Rev. Stat. Ann. § 12:83(B). The California statute, however, does not include the words "or otherwise," suggesting"a legislative intent that mandatory indemnification should depend upon a judicial determination of the actual merits of the agent's defense . . . ." American Nat'l Bank & Trust, 148 Cal. Rptr. at 118. Therefore, the American Nat'l Bank & Trust court's interpretation of California law has no bearing on Louisiana law.

**11** We note that Ille has not paid any portion of his defense costs. In his deposition of April 9, 1992, he testified that the Directors' attorneys represented him in defense of the OTS charges. Because his position was different from the other three Directors, he hired a personal attorney. He never received the bills from this attorney, who was paid by Barton. See J.A. 259-60.

III.

We next consider the district court's finding that the Employees acted in good faith and in the best interests of the Debtors. The district court found that:

> There is no evidence before this court that the employees had any reason to believe that their efforts in taking the company into bankruptcy were opposed to the best interests of the corporation. While Cone and Motahari were investigated for criminal conduct and the OTS brought administrative charges for breach of fiduciary duty against them, they were never found guilty of any charge. Braun and Trapani were never even named in any administrative or criminal proceeding. They were only questioned concerning actions taken in the discharge of their duties of employment.

In re Landmark Land Co. of Okla., Civ. Action No. 2:91-5286-1, order at 5 (D.S.C. Nov. 9, 1994) (J.A. 2518) (footnote omitted). We find the district court's reasoning to be somewhat illogical. The Employees had no involvement in the Directors' decision to take the subsidiaries into bankruptcy. The OTS investigated the Employees to determine whether, in conducting the business of the Bank, they participated in unsafe and unsound business practices or violated banking laws and regulations. The charges brought against Cone and Motahari focused on their representations to federal regulators that the Debtors owed to the Bank over $950 million in secured debt, when in fact the debt was unsecured. The government has never alleged that any of the Employees participated in the decision to place the Debtors into bankruptcy.

We therefore conclude that the district court's holding that the Employees acted in good faith and in the best interests of the Debtors was clearly erroneous, at least with respect to Cone and Motahari. The OTS alleged that Cone and Motahari engaged in unsafe and unsound business practices by arranging for the Bank to loan over $950 million to its subsidiaries without securing the debt for the Bank. The OTS further alleged that they misrepresented to federal regulators that the loans were secured. Although Cone's and Motahari's settlement agreement stated that they continue to dispute the

26

OTS charges against them, they accepted prohibition from practicing in the affairs of any insured depository institution and debarment from practicing before the OTS. In other words, the OTS kicked them out of the profession. Unlike the district court, which stated that the settlement agreement should not connote Cone's and Motahari's guilt, In re Landmark Land Co. of Okla., Civ. Action No. 2:91-5286-1, order at 5 n.4 (D.S.C. Nov. 9, 1994) (J.A. 2518 n.4), we conclude that their punishment is strong evidence that they acted in bad faith.[12]

With respect to Trapani and Braun, we see little evidence in the record on which to base a "good faith" determination, and therefore conclude that the district court's finding of good faith was clearly erroneous. Nonetheless, Trapani and Braun have a right to mandatory indemnification because they succeeded on the merits. Like Cone and Motahari, the OTS investigated Trapani and Braun for possible violations of banking statutes and regulations and for any participation in unsafe or unsound business practices. After this investigation, the OTS subpoenaed Trapani and Braun and made them give depositions under circumstances that were clearly adversarial. The OTS never filed any charges against Trapani and Braun. Under these circumstances, we conclude that they succeeded on the merits in their defense and are thus entitled to mandatory indemnification under La. Rev. Stat. Ann. § 12:83(B).

We therefore reverse the district court's granting of the Reimbursement Motion with respect to Cone and Motahari, and we affirm on different grounds the district court's granting of the motion with respect to Trapani and Braun.

IV.

We conclude that the district court erred in finding that Barton, Vaughan, Walser, Cone, and Motahari acted in good faith and in the best interests of the Debtors. Furthermore, we find that Ille, although

_____

[12] We note that some of the subsidiaries have already indemnified Cone and Motahari for a substantial portion of their defense costs. The government represented at oral argument that it sought only prospective relief and that it was not demanding that Cone and Motahari repay the amounts already received.

27

he acted in good faith and in the best interests of the Bank, was not an agent of Landmark Oklahoma and could not receive indemnification from that entity. Therefore, we reverse the district court's granting of the Reimbursement Motion with respect to those parties. We conclude also that Trapani and Braun succeeded on the merits in their defense and were entitled to mandatory indemnification from their employer, Landmark Louisiana. We therefore affirm, on different grounds, the district court's granting of the Reimbursement Motion with respect to Trapani and Braun.

Because of the grounds upon which we base our conclusions, we need not reach the numerous other issues raised by the parties.**13**

<u>AFFIRMED IN PART AND REVERSED IN PART</u>

_____

**13** We note that the appellees have filed a motion to dismiss this appeal. Because our decision in this case renders this motion moot, we take no action on the motion.

28